[734 NYS2d 42]

Seward Park Housing Corp., Respondent, v Carol Cohen et al., Appellants.

First Department, December 13, 2001

158

**APPEARANCES OF COUNSEL**

*Jeffrey R. Metz* of counsel (*Paul N. Gruber* on the brief; *Borah, Goldstein, Altschuler & Schwartz, P. C.,* attorneys), for respondent.

*Michael K. Brown* for appellants.

**OPINION OF THE COURT**

BUCKLEY, J.

This is a holdover summary proceeding by petitioner landlord to evict respondent tenant for harboring a dog. This case presents two questions arising from interpretation of a 1983 New York City ordinance.[1] The questions are:

(1) Where a tenant openly and notoriously harbors a pet for three months, with the actual knowledge of servants and employees at the building who are not required by the landlord to report this harboring, does the non-resident managing agent, nevertheless, by ordinance, have imputed knowledge of such harboring?

(2) Where the managing agent has such imputed knowledge, but fails to commence a proceeding to enforce a no-pet covenant within the three-month time limitation of the ordinance, has the landlord thereby waived its right to enforce the covenant?

For the reasons stated below, we answer these questions in the affirmative, reverse the divided Appellate Term (184 Misc 2d 245) and dismiss the petition, as did Civil Court.

A.

Forty-three years ago, Max Cohen, a sportswear cutter in the garment industry, his wife, Carol, and children, Ronald and Kenneth, moved into an apartment on the 19th floor of 415 Grand Street, a multiple dwelling on the Lower East Side of Manhattan owned by petitioner, a publicly funded cooperative corporation.

---

1. The ordinance, Administrative Code of the City of New York § 27-2009.1, is attached here as an appendix.

Max and Carol Cohen were tenants under a written lease which commenced on July 1, 1960 and ended on June 30, 1963, continuing thereafter on a month-to-month basis. Carol died in 1992. In 1996, Max, then age 65 and retired, continued to live in the apartment with his son, Kenneth. On September 13, 1996, Max purchased a four-month-old chow puppy for companionship, naming it Rocky and bringing Rocky home to live in the apartment. Before this, fellow building tenant Lisa Grossman was harboring a dog in her apartment and previously had a pending action against her commenced by petitioner landlord. The case ended with a stipulation that she could keep her dog in her apartment. Lisa Grossman had discussed her case with Max.

Cohen's lease contains a no-pet clause which reads that "(n)o animals of any kind shall be kept or harbored in the demised premises." The lease expressly precludes waiver of such no-pet clause by failure to enforce or by any other method unless confirmed in writing signed by petitioner. The managing agent first learned, in late November 1996, of the dog's presence in Max's apartment. Petitioner landlord commenced this proceeding on February 10, 1997.

At the trial, the managing agent of petitioner corporation and its only witness testified that the employees of Cambridge Security, the maintenance personnel and the porters are not required to report tenant harboring of pets. He further claimed that such a duty was not part of their guidelines, nor of the union contract. There was no proof offered by petitioner as to the applicable guidelines or union contracts. Also, there was no proof offered that any person or persons on the property, including resident board members, were charged with the duty of reporting such lease violations. Petitioner's managing agent neither resides in the cooperative nor maintains an office there and has been at the building only once in the preceding two years. Petitioner has no policy regarding the reporting of tenant pets by its employees or the security guards, who are employees of Cambridge Security. The managing agent had no knowledge that any of his employees, or the security guards, knew of Cohen's harboring of Rocky in September or October 1996.

Respondent Max Cohen, his son, Kenneth Cohen, and fellow building tenants Lisa Grossman and Ira Langman, testified that Max and Kenneth have walked Rocky, in and about the building, in the cooperative's yards during normal hours, three times a day since September 13, 1996, starting out from Max's

19th floor apartment, and that the security guards, maintenance workers and porters at the building, on a daily basis, saw Max and Kenneth with Rocky, spoke with Max and Kenneth about Rocky, petted Rocky and played with Rocky. This testimony of Max's and Kenneth's openly notorious harboring of the puppy and the actual knowledge of the security guards, maintenance workers and porters of this harboring was uncontroverted at the trial.

The decision of the trial court states, in part, as follows:

> "In the instant proceeding, it is undisputed that building personnel not only visually observed the dog but physically interacted with the pet on various occasions.

> "The credible evidence and testimony at trial was overwhelming that from the first day respondents brought the dog home it was exposed to and seen by building personnel on a regular basis. This Court finds that petitioner is bound by the acts of its employees. Knowledge of the existence of respondents' dog in mid-September 1996 must be imputed to petitioner. Petitioner's argument that security guards, janitors and porters at the subject building were merely independent contractors whose job description did not include informing petitioner of the harboring of dogs in violation of lease agreements, thereby tolling the statutory waiver period is not persuasive.

> "This Court determines that petitioner has waived its right to enforce a no-pet provision in respondents' occupancy agreement pursuant to Ad. Code § 27-2009.1. Accordingly, this proceeding is dismissed."

The Civil Court's fact findings are supported by the record and warrant the conclusion that petitioner waived its ability to enforce the no-pet clause.

### B.

While a dog may be man's best friend, landlords often discourage tenants from keeping pets. Opposition to pets often takes the form of no-pet clauses contained in the standard residential lease. Such clauses often preclude a waiver of a no-pet clause, either by the landlord's failure to enforce it, or by any other method unless confirmed in a writing signed by the landlord.

In 1983, the New York City Council, responding to widespread abuses by landlords who sought to evict tenants who harbored pets for an extended period of time, despite no-pet lease clauses, and without prior complaints by the landlord, enacted an ordinance (Local Law No. 52 [1983] of City of NY) which became Administrative Code § 27-2009.1. Its purpose, set forth in section 27-2009.1 (a) in sum, is twofold: (1) to protect pet owners from retaliatory eviction; and (2) to safeguard the health, safety and welfare of tenants who harbor pets. The ordinance sought to balance the rights of a landlord who acted promptly to evict a tenant upon learning the tenant harbored the pet, against the rights of a tenant who harbored such pet with the knowledge of the landlord, for an extended period of time (three months), without action being initiated by the landlord.

The no-pet waiver rule was intended to require that landlords enforce a no-pet clause promptly or be deemed to have waived that breach of the lease (*Megalopolis Prop. Assn. v Buvron*, 110 AD2d 232, 235-236 [implied waiver given retroactive effect]). The waiver applies to all "dwellings" which includes the cooperative apartment of respondent (Administrative Code §§ 27-2003, 27-2004 [a] [3]). It is undisputed that the rule, if the petitioner had knowledge and failed to commence the proceeding within the time provided by the ordinance, applies against petitioner to benefit respondent.

In *Megalopolis Prop. Assn. v Buvron* (*supra*, at 234), the Court observes that the ordinance applies to all existing leases:

"The law, which was to take effect immediately, applies to all existing leases * * *. [I]t expressly covers a tenant who openly and notoriously *has harbored a household pet for a period of three months or more following taking possession of a unit*, when a landlord, who has knowledge of the pet, has failed, within this three-month period of harboring, to commence a summary proceeding or action to enforce the lease provision prohibiting the keeping of such a pet" (emphasis in original).

The Court further held that the ordinance does not unconstitutionally impair the landlord's preexisting contract rights.

The City Council sought to allow a tenant the security and companionship of a pet when a landlord was not timely enforcing a no-pet lease covenant. As stated at the September 22, 1983 meeting of the Committee on Housing and Buildings by its then chairman and the prime sponsor of the ordinance,

" '[W]e are not eliminating the landlord's right to enforce a contract that says no pets, but at least *the landlord will have to be up front* through its agent, superintendent, in saying we are not a pet building, we don't permit pets. If you want to have a pet, we will not welcome you into our building because we will enforce it. *If they don't enforce it within the first three months or they wink at it, then the pet is there and cannot be removed'* " (quoted by *Megalopolis Prop. Assn. v Buvron*, at 236 [emphasis added]).

An analysis of the ordinance provided for the Committee on Housing and Buildings by City Council's legal staff stated that it

"creates a difficult burden for landlords with respect to *its scienter requirements* * * * [since it] *impute[s] an employee's knowledge to his employer."* (New York City Local Law Bill Jacket, 1983 Local Law No. 52, at 7 [emphasis added].)

This implied waiver made no-pet covenants unenforceable after three months of obvious pet ownership despite the parol evidence rule or lease merger clauses. All extant leases were thereby amended by operation of law to render no-pet clauses waivable under the terms of the ordinance (*Megalopolis Prop. Assn. v Buvron, supra*), including the proprietary leases of petitioner cooperative, since the pet law applies to cooperative housing (*Clearview Gardens Corp. v Volpicelli*, 213 AD2d 582). This ordinance specifically excludes buildings owned and managed by the New York City Housing Authority from this legislation. If the City Council had wished to exclude cooperatives from this ordinance it could easily have so specified. But it did not. Therefore, the exclusion of one implies the inclusion of all others (*Clearview Gardens v Volpicelli, supra; see, Board of Mgrs. v Lamontanero*, 206 AD2d 340; *see also, Linden Hill No. 1 Coop. Corp. v Kleiner*, 124 Misc 2d 1001; *Corlear Gardens Hous. Co. v Ramos*, 126 Misc 2d 416).

In *Metropolitan Life Ins. Co. v Friedman* (205 AD2d 303 [Met Life]), we decided that plaintiff landlord's failure to commence an action within three months after learning that defendants-tenants were harboring a dog in their apartment must be deemed a waiver of the "no-pets" provision in the parties' lease. Our decision in *Met Life* is contrary to *Park Holding Co. v Lavigne* (130 Misc 2d 396), an earlier decision of the Appellate Term. Having departed from the clear text of the

ordinance in *Park Holding*, the Appellate Term rendered the ordinance "toothless." We find our 1994 decision in *Met Life* to be controlling, and Appellate Term's 1985 decision in *Park Holding* should not be followed.

The dissent's reliance on *Baumrind v Fidelman* (183 AD2d 635) is misplaced. The dissent urges us to extend the holding in *Baumrind* to the case at bar. Were we to do so, we would gut the no-pet waiver ordinance. Instead, based upon our holding in *Met Life* and relying on the literal interpretation of this ordinance, we limit *Baumrind* to its facts. In *Baumrind*, the facts were unique and the decision turned on a stipulation of discontinuance without prejudice.

## C.

The plain meaning of this ordinance is to impute the actual knowledge of the landlord's servants and employees at the building to the non-resident managing agent under the facts of this case.

> "Where words of a statute are free from ambiguity and express plainly, clearly and distinctly the legislative intent, resort may not be had to other means of interpretation." (McKinney's Cons Laws of NY, Book 1, Statutes § 76.)

This Code provision is unambiguous. Section 27-2009.1 (b) states:

> "Where a tenant * * * openly and notoriously for a period of three months * * * harbors * * * a household pet * * * and the owner or his or her agent has knowledge of this fact, and such owner fails within this three month period to commence a summary proceeding or action to enforce a lease provision prohibiting the keeping of such household pets, such lease provision shall be deemed waived."

"Open and notorious" is defined as "[a]cts on the land of another sufficient to alert the owner of a claim to his land which may ripen into title under adverse possession." (Black's Law Dictionary 1090 [6th ed 1990].)

The waiver rule as enacted relies on objective, easily provable elements. Its key words, "openly and notoriously," are taken from the well-settled law of adverse possession. An adverse claimant, by his or her unequivocal acts, must have "open and notorious" possession of the land so that the real owner of the land will have knowledge of this hostile claim,

and will thereby be required to act to assert his or her legal title. This "open and visible or notorious" use is also required to establish an easement by prescription (2 NY Jur 2d, Adverse Possession, § 43).[2] It is essential that the owner have knowledge of the adverse possession or use. Actual knowledge is, of course, sufficient. Where, however, there has been no actual knowledge, it can be shown that the possession or use was so open, notorious and visible as to support an inference that the owner must or should have known of it. Knowledge can be either actual or imputed (2 NY Jur 2d, Adverse Possession, § 44).

"Notorious possession" is defined as "a requisite of adverse possession, such possession that is so conspicuous that, it is generally known and talked of by the public or the people in the neighborhood. Possession or character of holding in its nature having such elements of notoriety that the owner may be presumed to have notice of it and of its extent." (Black's Law Dictionary 1063 [6th ed 1990].)

The use of the phrase "openly and notoriously" in section 27-2009.1 (b) of the ordinance, therefore, shows a legislative intention to presume knowledge on the part of the landlord. In this ordinance, proof of "openly and notoriously" harboring of the pet in the apartment "for a period of three months or more" raises a presumption of knowledge by the owner or his managing agent of this fact (cf., Di Leo v Pecksto Holding Corp., 304 NY 505, 512 [if "open and notorious" element is proven the burden shifts to disprove actual knowledge]; Treadwell v Inslee, 120 NY 458, 465 [knowledge of open and notorious conduct presumed]; Ward v Warren, 82 NY 265, 267-270 [knowledge presumed]).

Our interpretation of this ordinance is consistent with basic rules of statutory interpretation. (See McKinney's Cons Laws of NY, Book 1, Statutes §§ 97, 98.) Conversely, if we require actual knowledge by the corporate landlord or his non-resident managing agent before the three-month "clock" starts ticking, the words "openly and notoriously" in the ordinance become meaningless. This is contrary to the clear intention and evident remedial purposes of the ordinance. This would lead to an absurd consequence. It renders the "open and notorious"

---

2. Adverse possession is for the most part regulated by statute while prescription is regulated by common law (id., § 2; see generally RPAPL 501; see also Real Property Law § 260; CPLR 212 [a]). The dissent compares the imputed knowledge of a landowner whose neighbor has possessed property for 10 years to a landlord whose tenant has possessed a dog for three months. In fact, the time in each case is strictly a legislative determination.

language superfluous, imposing on tenants a requirement not found in the ordinance, viz.: to prove actual knowledge of the landlord or managing agent.

Common sense dictates that landlords will have an agent or employee checking the property regularly. The Council's assumption in its ordinance conforms with common sense, providing an easily understood and objective determination of an instance when a waiver should be implied. From this we conclude that the three-month Statute of Limitations requires routine awareness on the part of the landlord. The ordinance leaves to the landlord's common sense what needs to be done for the landlord to become apprised of such a situation so that the landlord can, within this time, "commence a summary proceeding or action" (§ 27-2009.1 [b]).

The legislative declaration in section 27-2009.1 (a) states that this ordinance is necessary "to safeguard the health, safety and welfare of tenants who harbor pets." Using these words with "openly and notoriously" is consistent with applying the word "agent" in broad terms to include the maintenance staff, porters and security guards, who have actual knowledge that Cohen had harbored the dog in his apartment since September 13, 1996. Adopting a narrow definition of "agent" in the ordinance, however, would require us to ignore the actual knowledge of the maintenance staff, porters, and security guards that Cohen had harbored the dog in his apartment since September 13, 1996. The use of the phrase "openly and notoriously" in section 27-2009.1 (b) of the ordinance does show an intention to the contrary. This use is inconsistent with, and therefore refutes, the argument that security, maintenance personnel and porters are not "agents" for purposes of section 27-2009.1 (b).

Section 27-2009.1 (c) deems any express or other restriction of tenants' rights void as against public policy. Its clear intent is to protect from erosion the specific rights of tenants. In light of this "anti-restriction" provision under section 27-2009.1 (c), it would be incongruous for the municipal code to impose a duty on a landlord to take prompt legal action triggered by knowledge of its agent and at the same time find employees or servants best situated to acquire such knowledge incapable of communicating with their employer, or not duty-bound by the ordinance to do so. Such a result would ignore common sense and thwart the ordinance's remedial purposes. Here, the tenant's pet was observed daily by the landlord's employees. The trial court properly found these employees to be agents

within the meaning of the Code and therefore, correctly deemed this tenant's no-pet clause waived.

This ordinance sets forth rules which, of necessity, must be expressed literally. Three months means three months. The dissent's failure to offer a measure of when we can and cannot apply the literal terms of this ordinance highlights the problems created by abandoning the ordinance's literal language. This amounts to selective judicial enforcement of legislative commands. Because we find this ordinance to be free from ambiguity and to express clearly the legislative intent, we cannot condone the resorting to other means of interpretation (McKinney's Cons Laws of NY, Book 1, Statutes § 76). But, even if we did find this ordinance unclear, we would reach the same result.

### D.

The enactment of this ordinance was a valid exercise of police power by the City Council since it serves a legitimate public purpose (*Megalopolis Prop. Assn. v Buvron, supra*, at 237). The ordinance places the burden of timely enforcement on the landlord. Thus, it logically follows that where a tenant openly and notoriously harbors a pet for three months, with the actual knowledge of servants and employees at the building, even though not required by the landlord to report this harboring, the non-resident managing agent, nevertheless, by ordinance, has imputed knowledge of such harboring.

It is reasonable to treat both the landlord's own employees and the employees of its long-term independent contractor as statutory agents for acquiring information. The Code provision is generic. It is set in the context of an obligation imposed by law to require that the landlord promptly enforce a restrictive covenant. If not promptly enforced, the covenant is waived. Employees and also security guards were present to be "the eyes and ears" of petitioner. These servants and assistants are hired to and expected to report various types of information to the managing agent. An agent is presumed to communicate to his employer what he learns in the discharge of his expected duties (*Center v Hampton Affiliates*, 66 NY2d 782, 784; *Gropp v Great Atl. & Pac. Tea Co.*, 141 App Div 372, 376, *revd on other grounds* 205 NY 617).

This Code provision does not say that only the managing agent can acquire knowledge about pets. Indeed, when the Code intends to deal with a narrower class of landlord agents, it does so explicitly (*see, e.g.*, Administrative Code § 27-2095 [a]

[1] [service of process on managing agent]; § 27-2098 [a] [3] [managing agent must be identified in registration statement, authorized to effect emergency repairs, have certain qualifications]). It makes no distinctions based on the number of apartments. It does not distinguish among kinds of agents whose knowledge starts "the ball rolling" time-wise.

Were we to find the employees and security guards not to be "agents" within the meaning of this ordinance, their knowledge acquired as servants or employees of independent contractors within the course and scope of their duties should still be imputed to petitioner's managing agent. After all, the managing agent was responsible for supervising the performance of the employees and security guards in carrying out petitioner's duties pursuant to its lease with Cohen. And, under the ordinance, petitioner was obliged to "fish or cut bait," either timely enforcing this restrictive covenant or being "deemed" to have waived it (*cf., Soreca v New York City Hous. Auth.*, 177 AD2d 254; *Gibbs v Grenadier Realty Corp.*, 173 AD2d 171; *1700 York Assocs. v Kaskel*, 182 Misc 2d 586, 590).

While personnel and porters were not required expressly by the managing agent to identify or report lease violations, the issue is not whether the managing agent required them to report, but whether their actual knowledge should be imputed to the managing agent. Here, where there is no resident managing agent, it is reasonable to impute the knowledge gained by the landlord's agents to petitioner, as is clearly the legislative intent of the ordinance.

> "The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it." (*Center v Hampton Affiliates, supra*, at 784; *Farr v Newman*, 14 NY2d 183, 187.)

Imputing to petitioner and its managing agent the knowledge acquired by these employees while the employees were performing their duties for petitioner is proper since "[n]otice to an agent while acting within the scope of his duties constitutes notice to a principal." (*Ford v Grand Union Co.*, 268 NY 243, 252.)

The tenants had no reason to believe that the agents would not tell the landlord. There was no conflict of interest between the agents and the landlord, and there was no collusion be-

tween the agents and the tenants (*cf.*, *Henry v Allen*, 151 NY 1, 9; *Dollard v Roberts*, 130 NY 269, 273-274). If the ordinance provides tenants with protection by deeming a waiver, it is not up to this Court to substitute its own judgment by questioning who qualifies to be an agent.

Acceptance of petitioner's constricted reading of "agent" would encourage all absentee landlords to treat the ordinance with contempt. They would be able to stop permanently the running of the three-month period within which a holdover proceeding must commence just by not requiring prompt reporting of unwanted pets. Untimely attention to open and notorious pet harboring, or restriction of acquisition of knowledge of pet harboring, would bring us back "to Square One." It would re-create the pre-ordinance situation in which no-pet clauses lay dormant, ready for abuse, and would circumvent the remedial Code provision.[3]

Moreover, here, the managing agent of petitioner testified that the security, maintenance personnel and porters were not required to report tenant harboring of pets. He claimed that such duty was not part of their guidelines nor of the union contracts. Yet petitioner offered no other proof as to the existence or contents of guidelines or union contracts. Here, the trial court was justified in finding this testimony not persuasive. An unfavorable inference may be drawn when, as in this case, a party fails to produce evidence which is within its control and which it is naturally expected to produce (*Ausch v St. Paul Fire & Mar. Ins. Co.*, 125 AD2d 43, 48, *lv denied* 70 NY2d 610; 2 Wigmore, Evidence § 285 [Chadbourn rev 1979]; Prince, Richardson on Evidence § 3-139 [Farrell 11th ed]; 57 NY Jur 2d, Evidence and Witnesses, § 124).

The landlord may not avoid having imputed knowledge of the tenant harboring the pet by turning a "blind eye" to this open and notorious fact. Twenty-three years ago, Judge Gabrielli, for a unanimous Court in *Cohen v Hallmark Cards* (45 NY2d 493, 500) observed that:

> "The question of imputation of knowledge is a question of fact which must be resolved in light of all the circumstances of the case. We would note, however, that in many instances the imputation of

---

**3.** The suggestion of the dissent that, "[a]ll that the tenant need do is notify the landlord of the presence of a pet," is not responsive and begs the question. Such shifting of the burden from landlord to tenant would amount to judicial legislation.

knowledge, and its concomitant responsibility, may not be avoided by the simple expedient of closing one's eyes, covering one's ears, and holding one's breath."

The infrequent, selective and dilatory enforcement of no-pet clauses is an abuse which this ordinance was intended to remedy. This ordinance

"contemplates that where a tenant openly harbors a pet, visible to persons working on-site for the landlord * * * [a] landlord that maintains contact with the building through its on-site employees may not shield itself from the law by closing off that only channel of communication for obtaining notice of pets" (*1700 York Assocs. v Kaskel*, 182 Misc 2d 586, 590).

A review of the facts in this case reveals that petitioner would have had to close its eyes, cover its ears, and hold its breath to have remained ignorant of the presence of respondent's puppy.

The present action was not "commenced" within the three months permitted for enforcement (Administrative Code § 27-2009.1 [b]; *Megalopolis Prop. Assn. v Buvron, supra*). As a holdover petition brought in Civil Court, this action was commenced pursuant to specific statutes which unambiguously define "commencement" as service of petition and notice of petition (RPAPL 731; CCA 400). Petitioner served the petition and notice of petition commencing this proceeding no earlier than February 10, 1997. This was more than three months after September 13, 1996: (1) when respondent tenant openly and notoriously first harbored his pet; (2) when petitioner landlord's servants and employees had actual knowledge of such harboring, and thus; (3) when the managing agent of petitioner landlord had imputed knowledge of such harboring. Petitioner failed to commence this proceeding within three months after acquiring knowledge of such breach of the lease; so, enforceability was deemed waived pursuant to ordinance.

Since we find the actual knowledge of petitioner's employees and servants imputable, and since we find no reason to depart from the three-month commencement rule, we reverse and dismiss the petition, as did the trial court.

Accordingly, the order of the Appellate Term of the Supreme Court, First Department, entered February 25, 2000, which reversed an order of the Civil Court, New York County (Howard

Malatzky, J.), entered June 19, 1998, dismissing the petition and granting a final judgment of possession in favor of respondent tenant, should be reversed, on the law, without costs, and the petition dismissed.

### APPENDIX

*The Ordinance.*

The legislative declaration portion of the implied waiver ordinance, Administrative Code § 27-2009.1 (a), states:

> "The council hereby finds that the enforcement of covenants contained in multiple dwelling leases which prohibit the harboring of household pets has led to widespread abuses by building owners or their agents, who knowing that a tenant has a pet for an extended period of time, seek to evict the tenant and/or his or her pet often for reasons unrelated to the creation of a nuisance. Because household pets are kept for reasons of safety and companionship and under the existence of a continuing housing emergency it is necessary to protect pet owners from retaliatory eviction and to safeguard the health, safety and welfare of tenants who harbor pets under the circumstances provided herein, it is hereby found that the enactment of the provisions of this section is necessary to prevent potential hardship and dislocation of tenants within this city."

The implied waiver is at section 27-2009.1 (b) and provides:

> "Where a tenant in a multiple dwelling openly and notoriously for a period of three months or more following taking possession of a unit, harbors or has harbored a household pet or pets, the harboring of which is not prohibited by the multiple dwelling law, the housing maintenance or the health codes of the city of New York or any other applicable law, and the owner or his or her agent has knowledge of this fact, and such owner fails within this three month period to commence a summary proceeding or action to enforce a lease provision prohibiting the keeping of such household pets, such lease provision shall be deemed waived."

The Code deems any express or other restriction of tenants' rights void as against public policy under section 27-2009.1 (c):

> "It shall be unlawful for an owner or his or her

agent, by express terms or otherwise, to restrict a tenant's rights as provided in this section. Any such restriction shall be unenforceable and deemed void as against public policy."

FRIEDMAN, J. (dissenting). In *Baumrind v Fidelman* (183 AD2d 635, 636), this Court, pointing to the legislative history leading to the enactment of Administrative Code of the City of New York § 27-2009.1 (b), held that, although the Code provides that a landlord must "commence a summary proceeding" to avoid waiving its right to enforce a no-pet clause, an "[o]verly literal interpretation" of these statutory words is inappropriate. Today, in reversing Appellate Term's decision in this case, the majority overrules not only our decision in *Baumrind*, but also the Appellate Term's decision in *Park Holding Co. v Lavigne* (130 Misc 2d 396). In doing so, the majority holds that we should disregard legislative intent and find a waiver even though respondent's fellow co-op owners timely served him with a notice to cure demanding that he remove the pet.

This disregard of legislative intent is highlighted when one considers that Administrative Code § 27-2009.1 (b) was enacted to prevent landlords from evicting tenants for improper, retaliatory reasons, circumstances that are not present here. The difficulty with the majority's approach is all the more manifest considering that respondent is actually a part owner of the co-op corporation and, as noted, there is utterly no evidence that respondent's fellow cooperators sought to remove his pet for any improper reason.

Also troubling is the path the majority follows to reach its interpretation of the Code. I refer to its unsupported assumption that Administrative Code § 27-2009.1 (b) tracks the law of adverse possession and that just as we impute knowledge to a landowner where another has adversely possessed his property for 10 years (*see*, CPLR 212 [a]), we impute knowledge to a landlord whose tenant has possessed a pet for only three months.

It seems to me that the majority in its finding of waiver permits the Code to be used in circumstances that the City Council never envisioned. I therefore respectfully dissent.

Respondent Max Cohen is a member of a co-op corporation that owns a complex containing 1,728 apartments. As an integral part of this cooperative living arrangement, respondent and his fellow cooperators agreed to certain rules to govern

their conduct—rules that were intended to be mutually beneficial. Thus, the proprietary lease for this cooperative provides:

> "THE MEMBER COVENANTS THAT HE WILL PRESERVE AND PROMOTE THE MUTUAL OWNERSHIP PRINCIPLES UPON WHICH THE COOPERATIVE HAS BEEN FOUNDED, ABIDE BY THE CHARTER BY-LAWS, AND RULES AND REGULATIONS OF THE COOPERATIVE AND BY HIS ACTS OF COOPERATION WITH ITS OTHER MEMBERS BRING ABOUT FOR HIMSELF AND HIS CO-MEMBERS A HIGH STANDARD OF HOME AND COMMUNITY CONDITIONS."

One of the specific rules that respondent and his fellow cooperators agreed would be mutually beneficial to them was a rule prohibiting the harboring of pets. It is uncontroverted that respondent has violated this rule by purchasing a dog. Nevertheless, respondent asserts that he is entitled to keep a dog even though his fellow cooperators may not. Pointing to Administrative Code § 27-2009.1 (b), respondent argues that his fellow cooperators waived their right to enforce the no-pet rule because they failed to commence a summary proceeding within three months of the time that they became aware of his dog. The co-op's awareness, he asserts, stems from the fact that unidentified security guards and maintenance workers observed him with the dog. Respondent further asserts that, although his fellow cooperators served him with a notice to cure within three months of the alleged observations, service of the notice to cure was meaningless because the Code requires the actual commencement of a summary proceeding in order to avoid a finding of waiver. I do not believe that respondent's position has merit.

Administrative Code § 27-2009.1 (b) provides:

> "Where a tenant in a multiple dwelling openly and notoriously for a period of three months or more * * * harbors * * * a household pet * * * and *the owner or his or her agent has knowledge* of this fact, and such owner fails within this three month period to commence a summary proceeding or action to enforce a lease provision prohibiting the keeping of such household pets, such lease provision shall be deemed waived" (emphasis added).

In its legislative declaration accompanying the enactment of this law (Administrative Code § 27-2009.1 [a]), the City Council stated that the law was adopted in response to

*"widespread abuses by building owners or their agents, who* knowing that a tenant has a pet for an extended period of time, *seek to evict the tenant* \* \* \* for reasons unrelated to the creation of a nuisance" (emphasis added).

In order to assure that the remedial purposes of the statute are not obviated, subdivision (c) of the law provides that:

*"It shall be unlawful for an owner or his or her agent,* by express terms or otherwise, *to restrict a tenant's rights* as provided in this section. Any such restriction shall be unenforceable" (emphasis added).

With this statutory backdrop, three issues emerge on this appeal. The first concerns whether Administrative Code § 27-2009.1 (b) should be applicable to a cooperative. The second concerns the definition of "agent" for purposes of Administrative Code § 27-2009.1 (b). The third relates to the impact of a notice to cure vis-à-vis the commencement of a proceeding requirement contained within section 27-2009.1 (b).

Initially, it is uncontroverted that Administrative Code § 27-2009.1 (b) was enacted to protect tenants from unscrupulous landlords seeking to evict them for improper reasons. As the legislative record reveals, supporters of the law were particularly concerned with retaliation against tenant activists. Other supporters noted that landlords were using no-pet clauses as a method of evicting tenants so that they could get higher rents or obtain vacant apartments to further cooperative conversion plans. It is this legislative history that makes application of Administrative Code § 27-2009.1 (b) in this case so incongruous.

For so many New York City residents, condominium and cooperative "home" ownership has become increasingly popular—not only because of the economic benefits that flow from such ownership, but from a recognition of its social benefits, i.e., the promotion of the overall good of the cooperative community. In order to reap these benefits, all of the cooperative members jointly agree, as here, that certain rules of conduct are advantageous to the community as a whole and that these rules must govern their cooperative living arrangement.

The individual member's decision to participate in this "little democratic sub society" (*Hidden Harbour Estates v Norman*, 309 So 2d 180, 182 [Fla]) is, of course, completely voluntary since he or she always has the freedom not to purchase the apartment (*Matter of Levandusky v One Fifth Ave. Apt. Corp.*,

75 NY2d 530, 536). However, once having opted into this cooperative living arrangement, it is incumbent that each member abide by the rules in order to protect community expectations, as well as the financial investments made by fellow cooperators (see, id.).

Recognizing this, our courts have generally refused to intrude into the decision-making authority of cooperative boards and the rules they make (see, Matter of Levandusky v One Fifth Ave. Apt. Corp., supra; Jacobs v 200 E. 36th Owners Corp., 281 AD2d 281; Woo v Irving Tenants Corp., 276 AD2d 380). Hence, in the absence of a breach of fiduciary duty or impermissible discrimination, we have left it to the members of the cooperative, via their board of directors, to determine what rules are advantageous to the cooperative.

As becomes readily evident, by permitting section 27-2009.1 (b) to be used in the circumstances presented, the majority turns the law on its head and allows the Code to be used, not as a shield protecting tenants, but as a sword allowing one cooperative owner to breach his proprietary lease to the detriment of his fellow cooperators.[1] Suffice it to say that nothing in the legislative history of section 27-2009.1 (b) indicates that such an outcome was intended.

The majority nevertheless concludes that such an outcome was intended, stating:

> "[The Code] specifically excludes buildings owned and managed by the New York City Housing Authority from this legislation. If the City Council had wished to exclude cooperatives from this ordinance it could easily have so specified. But it did not. Therefore, the exclusion of one implies the inclusion of all others [citations omitted]."

In support of this exclusion/inclusion analysis, the majority relies upon the Appellate Division, Second Department's decision in Board of Mgrs. v Lamontanero (206 AD2d 340), from which this reasoning emanates. However, in Board of Mgrs. of Parkchester N. Condominium v Quiles (234 AD2d 130), this Court specifically rejected such an analysis, stating: "We disagree with the Second Department that condominiums should

---

1. While the majority notes that Lisa Grossman has been allowed to keep her dog following litigation, this emphasizes the problem with the majority's position. In a cooperative that contains 1,728 apartments, with the attendant difficulties in monitoring the residents of so many apartments, the majority's position results in a piecemeal undoing of the cooperative's rules.

be deemed covered by the Pet Law because not explicitly excluded." If the exclusion/inclusion analysis was rejected by this Court for purposes of determining whether condominiums fall within the ambit of the Code, I fail to understand how such an analysis can now be revived for cooperatives. To the extent that the majority places further reliance upon the Second Department's decision in *Clearview Gardens Corp. v Volpicelli* (213 AD2d 582), that case did no more than cite to the Second Department's *Lamontanero* decision, which, as noted, this Court rejected.

In any event, even if there were some indication that the Code should be applicable in the cooperative area, a finding of waiver is still not permissible. Concerning the definition of "agent" for purposes of the Code, respondent contends that any employee of a landlord, such as a security guard or mainte- nance worker, is the landlord's "agent" for purposes of Administrative Code § 27-2009.1 (b). The majority agrees with this proposition because the Code does not limit the type of agent who can acquire knowledge about pets. Close scrutiny of the Code, however, reveals otherwise.

It is a fundamental canon of statutory construction that "where the same word or phrase is used in different parts of a statute, it will be presumed to be used in the same sense throughout, and the same meaning will be attached to similar expressions in the same or a related statute" (McKinney's Cons Laws of NY, Book 1, Statutes § 236, at 401; *People v Bolden*, 81 NY2d 146, 151). Applying this canon of statutory construction in this case shows that the broad definition of agent advanced by the majority and respondent is not sustainable.

As previously noted, subdivision (a) of Administrative Code § 27-2009.1 indicates that the law was enacted because of wide- spread abuses by "agents" seeking to evict tenants for retalia- tory reasons. Subdivision (c), as noted, indicates that an "agent" may not restrict a tenant's right under this law, i.e., through provisions in the lease.

What becomes apparent is that employees such as security guards and maintenance workers are hardly in a position to "seek to evict * * * tenant[s]" and could not have been among those contemplated by the City Council when, in subdivision (a), it expressed its concern over "widespread abuses." Nor are such employees within the contemplation of subdivision (c) since security guards and maintenance workers are not cap- able of executing leases that attempt to circumvent the Code via lease provisions. This being so, it becomes apparent that

the word "agent" as used in both subdivisions (a) and (c) is not a broad reference to any and all employees of a landlord regardless of position, but a reference to employees with sufficient responsibilities to somehow affect the lease relationship.

It follows that security guards and maintenance workers are not "agent[s]" for purposes of subdivision (b) since that term is presumed to have the same meaning that it has in subdivisions (a) and (c) (*see*, McKinney's Cons Laws of NY, Book 1, Statutes § 236, *supra*). Accordingly, the fact that such personnel saw respondent's dog does not set the three-month statutory clock of subdivision (b) in motion and would not provide a basis for a finding of waiver.

Notwithstanding this, the majority asserts that "[a]cceptance of [a] constricted reading of 'agent' would encourage all absentee landlords to * * * stop permanently the running of the three-month period within which a holdover proceeding must commence just by not requiring [personnel to] prompt[ly report] unwanted pets." This concern is without foundation. Even in those instances where an absentee landlord has no employees at the premises, a tenant is always in a position to start the running of the three-month statutory clock. All that the tenant need do is notify the landlord of the presence of a pet. Accordingly, there is no possibility of a permanent toll.[2]

I also point out that, even if I were to share the majority's concerns, this is not a case where the landlord sought to insulate itself from a claim of waiver by purposely limiting the reporting duties of building personnel. The security personnel who observed respondent were employees of an independent contractor and operated under guidelines that charged them with providing security in the 1,728 unit complex. As to the maintenance workers, they operated under a union contract with clear specifications of duties that did not include reporting lease violations such as the presence of a dog. These limitations on the scope of duties arose from contractual relations unrelated to any improper motive on landlord's part. There is, therefore, no basis for classifying these workers as agents for purposes of the Code.

---

**2.** Respondent's focus on the lack of on-site employees whose responsibility it is to monitor pets is disingenuous to say the least. Although respondent is a tenant by virtue of his proprietary lease, he is also a part owner of the corporation and has a voice in its management (*see*, New York Condominium and Cooperative Law § 1:2, at 6). Thus, if there were not on-site employees whose job it was to report pets, this resulted from respondent's own failure, as a shareholder, to advocate for and have adopted a protocol for reporting pets.

More significantly, there were persons on the property who were charged with reporting lease violations, namely, resident members of the board of directors. In fact, it was one of those directors that brought respondent's breach of the lease to the attention of the board of directors, and the co-op timely commenced a summary proceeding within three months of receiving such notice. The presence of these board members demonstrates why the majority's concern about the absence of the managing agent from the co-op premises is not relevant.

In any event, and putting aside the agency issue, even if notice of respondent's dog were to be imputed to the co-op via the personnel who observed the dog, I would nevertheless conclude that there was no waiver. In our case, respondent's fellow cooperators served him with a notice to cure within three months of the observations made by the security guards and maintenance workers and thereafter promptly brought an eviction proceeding. In this regard, although Administrative Code § 27-2009.1 (b) provides that a landlord must "commence a summary proceeding" within three months of learning that its tenant is harboring a pet (and serving a notice to cure concededly does not commence a "proceeding"), we have previously rejected an "[o]verly literal interpretation" of the statutory words "commence a * * * proceeding" for purposes of section 27-2009.1 (*see, Baumrind v Fidelman,* 183 AD2d 635, 636, *supra; see also, Park Holding Co. v Lavigne,* 130 Misc 2d 396, *supra* [App Term, 1st Dept] [no waiver where landlord served respondent with notice to cure within statutory period]).

In *Baumrind,* the landlord attempted to commence a summary proceeding within three months of obtaining notice of respondent's dog. The proceeding was defective, however, because the landlord failed to properly serve the tenant with the notice of petition and petition. This defect meant that the summary proceeding was never commenced (*see, 528 E. 11th St. H.D.F.C. v Durieaux,* 164 Misc 2d 595 [summary proceeding commenced when service is complete, notwithstanding previous filing of notice of petition and petition]; *see also, Matter of Fry v Village of Tarrytown,* 89 NY2d 714, 720; *Markoff v South Nassau Community Hosp.,* 61 NY2d 283, 286). The landlord thereafter commenced a new proceeding more than three months after obtaining notice of the dog. We held that this tardiness was inconsequential. In so concluding, we noted that the City Council, by enacting Administrative Code § 27-2009.1 (b) (formerly § D26-10.10), "was expressly concerned with landlords who make no attempt to enforce their

rights under a no-pet clause for a long time, and then do so for bad faith reasons" (*Baumrind*, at 636), circumstances that were not present in *Baumrind*.

This Court's refusal in *Baumrind* to apply what it termed an "[o]verly literal interpretation" (*id.*) of the Code was well supported. Prior to the City Council's vote enacting Administrative Code § 27-2009.1 [as renum by L 1986, ch 839, § 68], the then Chairman of the Committee on Housing and Buildings stated that:

> " 'The testimony that we had at various hearings indicates that many of the landlords, in effect, *waive these clauses over long periods of time, years, but as soon as the tenants joined a tenant association or spoke up for tenants' rights*, they found they were being evicted because they violated the pet clause.

> " '*That is all that we are removing from the relationship between tenant and landlord.* It is a law that will be, that if the tenant keeps a pet openly and notoriously for a period of three months *and the landlord does nothing or has done nothing*, then the tenant [*sic*] will be deemed that the landlord has waived the anti-pet clause and the tenant will be able to keep that pet' " (quoted by *Megalopolis Prop. Assn. v Buvron*, 110 AD2d 232, 237 [emphasis added]).

The majority recognizes, as it must, that the City Council was specifically concerned with landlords who retaliate against tenants who assert their rights as tenants. Moreover, the City Council sought to impose a waiver when a landlord has "done nothing" to enforce its rights, which is certainly not our situation. Nevertheless, the majority concludes that we may not consider the Code in the context of its legislative history. I disagree, as did our own Court in *Baumrind*.

Here, just as in *Baumrind*, respondent could not possibly have been misled as to the intention of his fellow cooperators. The notice to cure served upon respondent unequivocally stated that he had substantially violated the terms of his tenancy by harboring a dog, and that if he did not cure the violation by December 17, 1996, the co-op would elect to terminate the proprietary lease. *Baumrind* leads to the inescapable conclusion that the notice to cure served upon respondent in this case was sufficient to preclude a finding of waiver under Administrative Code § 27-2009.1 (b). Moreover, no one, including respondent,

has alleged that his fellow cooperators were seeking to enforce the proprietary lease for improper reasons. There is, therefore, no basis for a finding of waiver.

Seeking to escape the grasp of our decision in *Baumrind*, the majority "limit[s] *Baumrind* to its facts," facts which it asserts "were unique." Tellingly, no explanation is offered of what is unique about *Baumrind*. Nor is an explanation offered of why this Court's refusal in *Baumrind* (at 636) to apply an "[o]verly literal interpretation" of the Code should now be rejected.

I also note that the majority's expansive construction of the Code creates practical problems in its future application, problems for which no solutions are offered. Common experience dictates that many small landlords in New York City do not have employees regularly on the premises of property they own (*see*, Administrative Code §§ 27-2053, 27-2054). When a tenant calls complaining of a leaky faucet or a non-functioning lock, these landlords call a plumber or a locksmith to resolve these problems. What the majority's analysis means is that these landlords, which it pejoratively refers to as "absentee landlords," can no longer enforce no-pet clauses unless they hire employees whose function it is to actually visit the premises and ferret out lease violators.

The difficulty with this result is that Administrative Code § 27-2009.1 is in derogation of a landlord's common-law right to demand compliance with the provisions of a lease. Because of this, we are not permitted to extend the reach of the law beyond "the clear import of the statutory language" (*Morris v Snappy Car Rental*, 84 NY2d 21, 28).

With this in mind, I do not dispute that the City Council intended to abrogate the common law. However, it did so only to the limited extent of precluding a landlord from enforcing a no-pet clause when it (or its agent as previously explained) knows of the presence of the pet and does nothing thereafter. There is nothing in the language of the Code, however, remotely suggesting that landlords must hire employees to continuously and actively investigate the possibility of illegally harbored pets in order to enforce a no-pet provision in a lease. Nor is there anything in the Code, let alone its legislative history, suggesting that a landlord is presumed to know of the presence of a pet, as the majority now holds. Moreover, even if there were such a presumption, the evidence rebutting it is uncontradicted. No one asserts that the co-op or its managing agent knew of the presence of a dog.

This brings me to what I believe is the most problematic aspect of the majority's analysis. At its core, the pivot point of

the majority's analysis rests on its interpretation of the statutory words "openly and notoriously." From the presence of these words in section 27-2009.1 (b), the majority concludes that, once a tenant harbors a dog openly and notoriously, a landlord is irrefutably presumed to have knowledge of the dog. This does not bear scrutiny.

If in fact section 27-2009.1 (b) merely provided that the open and notorious harboring of a pet was the single requirement for a finding of waiver, I might agree that knowledge could be presumed, as it is in the law of adverse possession. However, as previously indicated, section 27-2009.1 (b) provides that a waiver results "[w]here a tenant * * * openly and notoriously * * * harbors * * * a household pet * * * *and the owner or his or her agent has knowledge of this fact*" (emphasis added). Hence, the statute has a dual evidentiary predicate to its application, one of which includes the element of knowledge.

What the majority has done by its construction of the statute, therefore, is to elevate the open and notorious requirement to preeminent significance and render the language concerning the landlord's knowledge superfluous, a result that violates basic rules of statutory interpretation (*see, Leader v Maroney, Ponzini & Spencer,* 97 NY2d 95; McKinney's Cons Laws of NY, Book 1, Statutes § 231, at 388). Suffice it to say that if the City Council had intended, as the majority suggests, to merely require the open and notorious harboring of a pet to be sufficient to establish a waiver, there would have been no necessity to include the knowledge requirement in the statute.

Finally, the majority's apparent concern that the failure to find a waiver here would lead to widespread abuses and evictions overlooks RPAPL 753 (4). That statute provides that, where a tenant has breached a provision of the lease, "the court *shall* grant a ten day stay of issuance of the warrant, during which time the [tenant] may correct such breach" (emphasis added). This is precisely what the Appellate Term ordered in this proceeding, namely, it allowed the co-op to enforce the terms of the proprietary lease, and allowed respondent to retain his apartment.

In sum, there is no reason to expand the parameters of Administrative Code § 27-2009.1 (b) so as to include cooperatives within its umbrella, there is no reason to overrule the prior precedents of this Court in *Baumrind* and *Quiles,* and there is no reason to eliminate the knowledge requirement from the Code. The majority, with its reversal, does all of the above, and since I cannot agree, I vote to affirm the order of the Appellate Term.

NARDELLI, J. P., MAZZARELLI and LERNER, JJ., concur with BUCKLEY, J.; FRIEDMAN, J., dissents in a separate opinion.

Order of the Appellate Term of the Supreme Court, First Department, entered February 25, 2000, reversed, on the law, without costs, and the petition dismissed.