McKeon, PJ.
(dissenting). Contrary to the view of the majority and the housing court, I do not believe that there are factual issues warranting a trial and would award summary judgment to the Hymans (tenants) since they have established by documentary evidence and affidavits that the subject premises is a pet friendly building, and that the dog which tenants are alleged to be harboring, named Rocky, actually resides with and is owned by their daughter Julie Hyman.* While landlord essentially concedes that Rocky is a visitor, it asserts that the frequency and regularity of his visits violates the proprietary lease, which requires written permission from the landlord before a tenant may “harbor” or “keep” an animal. The fundamental flaw in landlord’s position is that it ignores that the word “harbor,” as typically used in residential leases throughout the metropolitan area and in the Pet Law (Administrative Code of City of NY § 27-2009.1), has been judicially construed to describe an animal which either resides in the tenant’s household (“household pet”) or is owned by the tenant (“tenant’s pet”; “pet owner”) (Seward Park Hous. Corp. v Cohen, 287 AD2d 157 [2001]; Board of Mgrs. v Lamontanero, 206 AD2d 340, 341 [1994]), not an animal who visits a tenant, nor *83 the tenant who permits the visit. Thus, the governing proprietary lease cannot be interpreted to require written permission for a visiting animal. I, therefore, respectfully dissent.
By way of background, tenants have resided at the subject premises for more than four decades. Several years ago, tenant Rita Hyman was involved in an automobile accident that left her with significant disabilities, and her father, a Holocaust survivor who lives in his own apartment in the subject building, lost his wife of many years to cancer. In the aftermath of these sad events, Julie Hyman began bringing her now six-year-old Maltese poodle, named Vegas, for regular visits to her parents and grandfather. No objection was voiced by landlord at the time these visits began. Years later, Julie Hyman purchased Rocky, who accompanied Vegas on these daily visits to tenants. By all accounts, the animals are well behaved and there is no claim that their presence constitutes a nuisance. For the most part, Julie Hyman leaves the animals in her parents’ apartment while she assists her mother with chores, takes her to medical appointments, or otherwise does that which a caring daughter does for an ailing mother. Additionally, the presence of the animals seems to pick up the spirits of Mrs. Hyman’s father.
Unfortunately, relations between landlord and tenants have not been good. There were disputes involving a parking space and repairs to tenants’ apartment. There were complaints to the Human Rights Commission and a companion lawsuit in addition to this proceeding brought to terminate the Hymans’ tenancy.
Any discussion about landlord’s legal position must begin with its assertion before housing court that the Pet Law is inapplicable “to the facts as asserted by Respondents. If in fact the dog is not owned by respondents [argued landlord] . . . the Administrative Code bears no relevance . . . and does not shield non-resident visitors or their pets.” While I agree that the Pet Law does not apply to visiting animals, landlord’s embrace of this interpretation apppears to undermine, not support, its legal posture in this proceeding. Put another way, what landlord cannot explain is this: if the Pet Law, by its express language, applies to tenants who “harbor” animals, how does landlord reconcile its position that tenants have “harbored” an animal in violation of their lease, yet assert that the Pet Law offers them no protection? The answer is obvious: “harbor” cannot be equated with permitting an animal to visit.
Next, landlord never explained in argument to this court why it did not include Vegas in this proceeding. Below, landlord as *84 serted that it “may have waived its right to insist on the removal of the first dog,” without specifying what it believes it waived. If, as landlord urges, the Pet Law does not apply to the scenario under review, the “no waiver” provision of the lease remained enforceable and landlord was free to rely on tenants’ actions relative to Vegas in support of its quest for eviction.
Landlord appears to realize its dilemma because in argument before housing court it asserted that if the Pet Law applied to Rocky and he was observed more than three months prior to the service of the predicate notice, such sighting should not be held to provide notice because landlord could not possibly know that Rocky would be a daily visitor to the premises. Of course, landlord cannot cite a case to support this posture — there is none. But, putting the Pet Law aside, what about landlord’s claimed interpretation of its house rules requiring written permission before an animal may visit the premises? Why wasn’t that rule enforced when Rocky was first seen? Or, for that matter, when Vegas was first seen, years earlier. Of course, landlord’s inaction toward Vegas may well be evidence that landlord never required written approval before an animal could visit the premises. Indeed, landlord’s failure to cite one previous instance where it sought to evict a tenant for permitting visiting animals without written approval suggests that its interpretation of the rule is of recent vintage, since
“[t]he practical construction or uniform conduct or practice of the parties under a contract is a consideration of much importance in ascertaining its meaning, and that consideration is entitled to great, if not controlling, weight in ascertaining the parties’ understanding of the contract terms and language, since the parties are in the best position to know what was intended by the language employed.” (17A Am Jur 2d, Contracts § 354.)
Simply put, landlord’s legal posture in this proceeding amounts to nothing more than a hodgepodge of irreconcilable legal theories, designed to achieve an outcome utterly at odds with its past practice and unsupported by legal authority. Even so, all of landlord’s legal theories lead to the same destination, an award of summary judgment to tenants.
Schoenfeld and Shulman, JJ., concur; McKeon, EJ., dissents in a separate opinion.

 Below, landlord sought summary judgment, its lawyer alleging in an affidavit that “the case at hand is ripe for summary judgment because there are no issues of material fact in dispute in this proceeding.”