OPINION OF THE COURT
Jack M. Battaglia, J.
After a bifurcated trial, the jury determined that the infant plaintiff, Haleemeh M.S., should recover total damages of $3 million from defendant MRMS Realty Corp., as compensation for personal injuries she sustained on October 3, 2002 when she fell to a courtyard from a window in her family’s apartment on the fourth floor of a building at 316 68th Street, Brooklyn, premises owned by MRMS Realty. The jury also in effect determined that MRMS Realty should recover 30% of the total damages from the infant’s father, Mohammad S.F., on MRMS Realty’s claim against him for contribution. Also, based upon the jury’s verdict at the end of the liability phase of the trial, the court dismissed the action against defendant Milasen Construction Corp.
MRMS Realty now moves, pursuant to CPLR 4404 (a); 4111 (c); and 5501 (c), to set aside the jury’s verdict as to its liability, and to either enter judgment in its favor as a matter of law, or grant a new trial on both liability and damages, or reduce the amount of damages as excessive. Since Mohammad S.F. does not move, either in his representative or individual capacity, to set *445 aside the jury’s verdict as to his fault in bringing about the infant plaintiffs injuries, the jury’s findings on those issues are a given on this motion. Also, the court is not being called upon to reconsider its determination, based upon the jury’s factual findings, to dismiss the action as against Hilasen Construction. The court’s discussion of facts as to Hilasen is for purposes of full context.
Over 13 trial days, the jury heard from a total of 15 witnesses. As to liability, the following witnesses testified: the infant plaintiff, Haleemeh H.S.; her father, Hohammad S.F.; her mother, Raga H.; her uncle, Hoshin H.; Steven H. Tsevedos, a principal in both HRHS Realty Corp. and Hilasen Construction Corp.; Police Officer Edward William Wallace, Jr., who investigated the accident; Andre Johannes, who inspected the S. apartment after the accident for the Window Guard Unit of the Department of Public Health; and two other residents of the building, Haryann Hiller and HaryAnn Cicchetti. As to damages, the jury again heard from the infant plaintiff and her parents, and three doctors testified: a pediatric orthopedic surgeon, Gail Chorney, H.D.; and two pediatric cardiologists, Charles S. Kleinman, H.D. and Rubin Cooper, H.D.
The jury’s verdict as to liability, to the extent relevant on this motion, consists of affirmative answers to the following four questions: “Was defendant HRHS Realty Corp. negligent in not maintaining the window guard in the living room of Apt. 21 so that it was securely attached to the window on October 3, 2002?”; “Was the negligence of HRHS Realty Corp. a substantial factor in bringing about the child’s fall from the window?”; “Was the child’s father, Hohammad S.F., negligent in removing or permitting the removal of the window guard in the living room of Apt. 21 for the purpose of installing an air conditioner, and not re-installing the window guard so that it was securely attached on October 3, 2002?”; and “Was the negligence of the child’s father a substantial factor in bringing about the child’s fall from the window?” The jury then allocated “the percentage of fault for each of the persons who were found negligent and whose negligence was a substantial factor in bringing about the child’s fall from the window” as 70% to HRHS Realty and 30% to Hr. S.
As to damages, the jury awarded $225,000 for past pain and suffering, $775,000 for future pain and suffering, and $2 million for future medical expenses, with the awards for the future intended to provide compensation over 58 years.
*446 There is no dispute that the infant plaintiff fell from the fourth-floor living room window because the window guard that was required by law to be installed was not securely attached to the window. To the extent now relevant, the claim against MRMS Realty is based upon New York City’s window guard regulation (see NY City Health Code [24 RCNY] § 131.15). Plaintiffs counsel argued to the jury that MRMS Realty violated the regulation, and that MRMS’s violation was the sole cause of the infant plaintiffs fall. While disputing any violation of the regulation, MRMS Realty maintained that the infant’s father removed the window guard from the living room window in order to install an air conditioner, then failed to properly secure the window guard after the air conditioner was removed, and that the father’s negligence was the sole cause of the infant plaintiffs fall.
As indicated, the jury determined that both MRMS Realty and the infant’s father were negligent in a manner that contributed to causing the infant’s fall, and ascribed the greater degree of fault to MRMS. In so doing, the jury adopted a view of the facts that was not specifically argued by either party, and that was not specifically addressed in the court’s instructions.
As to liability, defendant’s motion is made pursuant to CPLR 4111 (c) and 4404 (a). CPLR 4111 (c) is not applicable here because there was no general verdict accompanied by answers to written interrogatories, and, in any event, no inconsistencies in the jury’s answers to the questions submitted. Under CPLR 4404 (a), the court may set aside a jury verdict “and direct that judgment be entered in favor of a party entitled to judgment as a matter of law or it may order a new trial. . . where the verdict is contrary to the weight of the evidence.” The standards applicable to the motion are familiar.
“There must be ‘no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial’ in order to set aside a judgment and direct judgment in favor of a party entitled to judgment... A jury verdict should not be set aside and a new trial ordered ‘unless the jury could not have reached the verdict on any fair interpretation of the evidence.’ ” (LePatner v VJM Home Renovations, 295 AD2d 322, 323 [2d Dept 2002], quoting Cohen v Hallmark Cards, 45 NY2d 493, 499 [1978] and Nicastro v Park, 113 AD2d 129, 134 [2d Dept 1985]; see also Travel *447 ers Indem. Co. v S.T.S. Fire Prevention, 41 AD3d 835, 835-836 [2d Dept 2007]; Taylor v Martorella, 35 AD3d 722, 723-724 [2d Dept 2006].)
As to the potential liability of MRMS Realty, the jury was instructed in accordance with PJI 2:10, 2:12, 2:29, 2:70 and 2:90. Specifically, the court charged the following provisions of the window guard regulation:
“131.15. Window guards.
“(a) The owner, lessee, agent or other person who manages or controls a multiple dwelling shall provide, install, and maintain, a window guard, of a type deemed acceptable by the Department, installation to be made pursuant to specifications provided by the Department on the windows of each apartment in which a child or children ten (10) years of age and under reside . . .
“(d) (1) Failure to install or maintain window guards pursuant to this section is hereby declared to constitute a public nuisance and a condition dangerous to life and health . . .
“(2) Every person obligated to comply with the provisions of subsection (a) is hereby ordered to abate said nuisance and condition by installing and maintaining the required window guards forthwith.” (NY City Health Code [24 RCNY] § 131.15.)
Although not included in the instructions to the jury, Department of Health regulations include: a definition of “[i]nstallation of window guard” as meaning “proper installation and maintenance of window guards in a manner approved by the Department” (see NY City Health Code [24 RCNY] § 12-01); “Specifications for Window Guards for Double Hung Windows” (see NY City Health Code [24 RCNY] § 12-10); and “Specifications for Window Guards for Other Than Double Hung Windows” (see NY City Health Code [24 RCNY] § 12-11). The specifications require that “[s] crews used to mount window guards . . . shall be one-way . . . metal screws or metal tamper resistant screws.” (See NY City Health Code [24 RCNY] § 12-10 [h]; § 12-11 [j].) “Tamper resistant screws are defined as screws requiring special tools for their installation and/or removal, which tools are not readily available in retail hardware stores.” (See id.) “Appropriate screws” must be “minimum size #10,” long enough to penetrate one inch into a wooden window frame, and of “adequate type, size and length to be securely fastened to a metal window frame.” (See NY City Health Code [24 RCNY] § 12-10 [h] [1], [2]; § 12-11 [j] [1], [2].)
*448 The window guard regulation also provides that “[n]o tenant or occupant of a multiple dwelling unit, or other person shall obstruct or interfere with the installation of window guards required by [the regulation], nor shall any person remove such window guards.” (NY City Health Code [24 RCNY] § 131.15 [b].) This provision was not charged in connection with the potential liability of the infant’s father because neither MRMS Realty nor Hilasen Construction requested it. As to the infant’s father, the jury was charged in accordance with PJI 2:10, 2:12 and 2:70.
“[T]he window-guard regulations were enacted to protect the lives and safety of young children by reducing the frequency of window falls . . ., without regard to the manner in which those falls occur.” (See Cunningham v L.P.T.G. Farragut Realty Corp., 200 AD2d 651, 652-653 [2d Dept 1994].) There is no question but that the window guard regulation was applicable here, and that the infant plaintiff was within the class that was to be protected. The question is whether MRMS Realty violated the regulation, and, if so, whether its violation was a proximate cause of the infant plaintiffs fall from the window.
Since the jury found that the window guard installed on the living room window in the S. apartment was removed by or with the permission of the infant plaintiffs father so as to allow installation of an air conditioner, any negligence of MRMS Realty must be assessed, at least initially, as of that point in time. Indeed, plaintiffs postverdict theory as to the liability of MRMS is that, “Consistent with New York law, this Court’s instructions permitted the jury to determine that MRMS was negligent because of MRMS’s admitted failure to inspect,” and that “if MRMS had inspected the window guards and ensured that City-approved guards and hardware had been installed, then plaintiffs father would never have been able to remove[,] or alter the condition of, that guard.” (Affirmation in opposition 1i 7.) Further, that “the verdict reflects the jury’s apparent determination that plaintiffs father would have been unable to remove the guard if MRMS had used city-approved guards which cannot be removed without special tools.” (Id. If 24.) “Had MRMS, in the first instance, reasonably inspected and maintained window guards in the apartment, plaintiffs father would never have been able to remove the guard with a simple screwdriver, and the jury so found.” (Id. 1f 36.)
As should be apparent, plaintiffs contentions assume that inspection of the window guards in the S. apartment, at some *449 time before the window guard in the living room window was removed to allow the installation of an air conditioner, would have revealed that the screws used to affix the window guard were not “City-approved” such that the guard could not be removed without “special tools.” But that assumption, and the contentions that rest upon it, must be supported by evidence that would allow at least a reasonable inference that the window guards in the S. apartment, and in the living room window in particular, were not in fact affixed with tamper resistant screws requiring special tools.
There was no direct evidence at trial as to the screws with which the living room window guard was affixed before its removal by the infant plaintiffs father. As plaintiff correctly points out, Mr. Tsevedos, MRMS’s principal, testified that no one on behalf of MRMS inspected or repaired any of the window guards in the S. apartment from the time of the building’s purchase in 1997 until the infant plaintiff’s fall. The infant plaintiffs father testified that in spring 2002, severed months before the child’s fall, he complained to Rene Castellanos, the building’s superintendent, that the window guard in the living room window was loose, and that Mr. Castellanos inspected the guard and attempted to properly secure it. The jury rejected the father’s testimony by answering “no” to the first question on the verdict sheet, “Did Mr, Castellanos either inspect or service the window guard in the living room of Apt. 21, or both, in Spring 2002?”
But the infant’s father testified further, in deposition testimony read to him at trial, that Mr. Castellanos had “special tools for the screws and nobody else can do it but him.” (Trial transcript [TT] at 211.) Mr. S. explained that he “was answering a question about the air conditioner] and how he was fixing the air conditioner in the window.” (TT at 212.) Both the infant’s father and the infant’s mother testified that, each year, Mr. Castellanos would assist in installing, and then removing, air conditioners into and from the windows of the two bedrooms. As stated by the father: “When summer comes in, he was coming to fix the air condition[er]. And then when winter, he was taking it off.” (TT at 228.)
Even accepting that the father’s testimony as to Mr. Castellanos’ use of “special tools” was limited to the window guards and screws in the bedroom windows, since, as will appear, plaintiff maintains that evidence as to the guards and screws in the other windows in the apartment allows an inference as to *450 the guard and screws in the living room window, the only inference is that the screws were of the type that required “special tools” pursuant to the regulations.
Andre Johannes inspected the window guards and screws in the S. apartment after the child fell from the living room window. He explained that the Department of Health would assign “approval numbers” to window guards submitted for approval; that the regulatory scheme requires “approved guards” and “approved screws”; and that, in the absence of an approval number, a guard and accompanying screws are deemed “unapproved.” (TT at 374, 376, 390.)
Reading from a report that was not offered into evidence (without objection by defendants on that ground), Mr. Johannes testified that the window guard in one of the bedrooms was affixed with “unapproved screws,” and that the window guard in the kitchen was affixed with “improper screws.” (TT at 378, 379.) Plaintiff argues that “[t]he violations concerning the other windows were relevant to . . . whether MRMS discharged its duty to inspect and reasonably maintain the window guards” (affirmation in opposition If 37), and that “the jury likely and reasonably concluded that the guard in the living room from which Plaintiff fell likewise was fitted with improper screws” {id. If 39).
Contrary to MRMS’s contention that the testimony of Mr. Johannes as to the window guards and screws found on other windows was inadmissible on the question of the window guard and screws installed in the living room window, the court finds sufficient foundation in the testimony of Mr. Tsevedos and common experience to allow an inference that the window guards and screws were installed contemporaneously in all of the apartment windows and were of the same type. As the court noted during the extensive discussion at trial concerning the admissibility and scope of Mr. Johannes’ testimony (which resulted in the exclusion of any testimony concerning window guards in the other apartments in the building), as between plaintiff and MRMS, the owner of the building would have access to any evidence as to the time of installation of the window guards, and as to the type or types of guards and screws that were used.
There is a substantial difference, however, between admissibility and probative value, particularly when evidence is considered in light of other evidence in the case. First, Mr. Johannes never described the screws that attached the window guards in the other rooms of the S. apartment, nor did Mr. Jo *451 hannes describe in what way(s) the window guards and screws were “unapproved.” In the absence of such further description, the window guards and screws could have been deemed “unapproved” for not showing an “approval number.” That a window guard and screws are “unapproved,” without further evidence that the guard or screws failed in some respect to comply with the window guard regulation, could not be a proximate cause of a child’s fall. (See Travelers Indem. Co. of Ill. v 28 E. 70th St. Constr. Co., Inc., 296 F Supp 2d 476, 487-488 [SD NY 2003].) Moreover, plaintiff’s contention does not account for the testimony that the window guards and screws in the bedrooms had been removed and reinstalled to accommodate air conditioners, and there was no evidence as to when an inspection would have revealed the “unapproved” screws.
Plaintiff also relies on the testimony of Detective Wallace, who investigated the child’s fall on the same day, and “recovered” from the courtyard “a one and three quarter inch one [szc] white metal Phillips head wood screw and a one and one and [szc] a half inch long white metal Phillips head sheet metal screw.” (TT at 477.) Detective Wallace “searched the courtyard extensively and . . . also searched the living room and the air conditioning unit below the living room’s window and could not find any other screws other than these two.” (Id.) Plaintiff contends that “[t]he jury’s apparent conclusion that the wrong screws had been used to affix the guard was further corroborated by the recovered screws — which were not the type required for use on the window guards.” (Affirmation in opposition 1i 30.)
Detective Wallace was unable to conclude that the two screws he “recovered” had been used to attach the window guard to the S.s’ living room window, and nor could the jury. In any event, in the absence of any testimony by the infant’s father that, on reinstallation of a window guard after removal of an air conditioner, the same screws were used as had been removed when the guard was removed, there is no basis to conclude that any screws used to attach the window guard after removal of the air conditioner would have been present, and discoverable on inspection, before the guard was removed to accommodate an air conditioner.
In sum, there was insufficient evidence for the jury to conclude that, had MRMS inspected the window guards in the S. apartment before they were removed to accommodate air conditioners, MRMS would have discovered screws that did not *452 comply with the window guard regulation in a way that would have facilitated the father’s removal of the guards. Any such negligence in failing to inspect at that time, therefore, was not shown to be a substantial factor in bringing about the child’s fall, and the jury was not permitted to conclude to the contrary.
For this reason, MRMS’s contention that the negligence of the infant’s father in connection with the removal and reinstallation of the window guard “was not only a substantial factor in causing the infant plaintiffs injuries, as the jury found, but an intervening, superseding cause which broke the causal chain between any alleged conduct of MRMS and the infant plaintiffs fall” (affirmation in support of posttrial motion 1Í 9) is inapposite. The court need not decide, therefore, whether the father’s conduct “was not a foreseeable consequence of the alleged negligence by MRMS in maintaining the guard before the plaintiff father installed the air conditioner” (id. If 38), or whether a failure to use the tamper resistant screws required by the window guard regulation would merely “furnish the occasion” for the father’s conduct (reply affirmation in further support of MRMS Realty Corp.’s posttrial motion 1Í1Í 23-25).
The question, then, is whether there is sufficient evidence to support a jury verdict that MRMS was negligent after the infant’s father removed the window guard. The court charged the jury that there was “no dispute . . . that on October 3, 2002, the window guard was not securely attached to the window” (TT. at 802); and further:
“In order to find that MRMS Realty’s conduct was negligent, you must find either: A, that MRMS Realty knew of the unsafe condition long enough before the child’s fall to have permitted MRMS Realty in the use of reasonable care to have it corrected and did not do so; or B, that MRMS Realty did not know of the condition, but in the use of reasonable care should have known of it and corrected it.
“If you find that MRMS Realty did not know of the condition and that by the use of reasonable care it would not have been able to discover it and correct it, you will find that MRMS Realty was not negligent.
“On the other hand, if you find that MRMS Realty knew of the condition or would have been able to discover it by the use of reasonable care but that it failed to correct the condition, you will find that *453 MRMS Realty was negligent.” (TT at 803.)
The jury was also told that the window guard regulation requires the owner of a multiple dwelling to “provide, install, or maintain a window guard of a type deemed acceptable” by the Department of Health, with “[installation to be made pursuant to the specifications provided by the department” (TT at 804, quoting NY City Health Code [24 RCNY] § 131.15); and that, if the jury found that MRMS violated the regulation, it could “consider the violation as some evidence of negligence, along with the other evidence in the case, providing that such violation was a substantial factor in bringing about the event” (TT at 803-804).
The jury’s consideration of possible negligence on the part of MRMS was not restricted as to time period, nor was it limited by reference to the infant father’s removal of the window guard, if the jury should so find. The court rejects MRMS’s contention of error in the order of the interrogatories on the verdict sheet, i.e., asking the jury to consider MRMS’s possible negligence before it considered any possible negligence of the father (affirmation in support of posttrial motion lili 73-76). Whether the negligence of the father is considered from the perspective of MRMS’s claim for contribution or for purposes of a CPLR article 16 allocation of fault, an assessment of MRMS’s possible negligence in the first instance was appropriate, if not necessary. Moreover, neither party asked the court to specifically instruct the jury if both were found negligent. Indeed, the case was tried, and argued to the jury, essentially on an either/or basis, i.e., either MRMS was responsible, or the infant’s father was responsible.
Although the window guard regulation recognizes the risk that a guard will be removed after installation — both in its requirement for “tamper resistant screws” and its prohibition of removal of a window guard — the regulation does not address in terms a building owner’s responsibility where a tenant removes a guard and either does not put it back or does so improperly. This is, perhaps, surprising given the prevalence of window air conditioners in the City, the necessity of removing a window guard in order to install the air conditioner, and the common practice of installing and removing window air conditioners on an annual basis.
In determining, therefore, whether the building owner’s obligation under the regulation to “maintain” a window guard (see NY City Health Code [24 RCNY] § 131.15) provides a basis *454 for a duty to use reasonable care to ensure that the guard not be removed by a tenant or, if removed, is properly reinstalled, other regulatory and common-law authorities must be considered. Arguably, the most analogous regulatory scheme is New York City’s lead paint abatement ordinance, Local Law No. 1 (2004) of the City of New York (see Administrative Code of City of NY § 27-2056.1 et seq.). Since no showing has been made to the contrary, the court assumes that, like the lead paint abatement ordinance (see Juarez v Wavecrest Mgt. Team, 88 NY2d 628, 643-645 [1996]), the window guard regulation does not prescribe liability without fault, at least to the extent that it might impose a duty upon the building owner to remedy a dangerous condition created by the tenant with respect to a window guard.
Several Appellate Division decisions have recognized that a building owner may claim against the child’s parent in a lead paint case where the parent allegedly created or exacerbated the lead paint condition. (See M.F. v Delaney, 37 AD3d 1103, 1105 [4th Dept 2007]; Ward v Bianco, 16 AD3d 1155, 1156-1157 [4th Dept 2005]; Cantave v Peterson, 266 AD2d 492, 493 [2d Dept 1999]; Alharb v Sayegh, 199 AD2d 229, 230 [2d Dept 1993].) These decisions clearly imply that, at least in some circumstances, a building owner may be liable for a lead paint condition notwithstanding negligence of the child’s parent contributing to the harm, but the decisions provide no framework or other insight for assessing the building owner’s alleged negligence.
Like the lead paint abatement ordinance (see Juarez v Wavecrest Mgt. Team, 88 NY2d at 643), Multiple Dwelling Law § 78 provides both context and content for the window guard regulation. “[T]he Multiple Dwelling Law . . . directs that ‘[e]very multiple dwelling . . . and every part thereof . . . shall be kept in good repair’ ” (see 88 NY2d at 643, quoting Multiple Dwelling Law § 78 [1]), and “imposes upon a landlord ‘a duty to persons on its premises to maintain them in a reasonably safe condition’ ” (see id., quoting Mas v Two Bridges Assoc., 75 NY2d 680, 687 [1990]). “New York City landlords are further charged under the Administrative Code with the responsibility for safe maintenance of their buildings and facilities.” (Id., citing Administrative Code former §§ 27-127, 27-128.)
Of particular note for present purposes is the following provision of Multiple Dwelling Law § 78: “The owner shall be responsible for compliance with the provisions of this section; but the tenant also shall be liable if a violation is caused by his *455 own wilful act, assistance or negligence or that of any member of his family or household or his guest.” (See § 78 [1] [emphasis added].) The import is clear: an owner is not relieved of “responsibility” because a violation of the duty to maintain the premises “in good repair” (see id.) is “caused” by the tenant’s negligence.
Even where, however, a landlord’s liability is governed by Multiple Dwelling Law § 78 (1) and a city ordinance or regulation, like Local Law 1 or the window guard regulation, common-law principles still apply to the extent not expressly abrogated. (See Juarez v Wavecrest Mgt. Team, 88 NY2d at 646.)
“It is well settled that in order for a landlord to be held liable for injuries resulting from a defective condition upon the premises, the plaintiff must establish that the landlord had actual or constructive notice of the condition for such a period of time that, in the exercise of reasonable care, it should have been corrected.” (Id.)
Here, as indicated above, the court charged the jury in accordance with these principles. There was no evidence from which the jury could rationally determine that MRMS had actual notice on October 3, 2002 that the window guard in the living room window of the S. apartment was not properly secured. The question becomes, therefore, whether MRMS had constructive notice of the condition “for such a period of time that, in the exercise of reasonable care, it should have been corrected” (see id.).
“Constructive notice” is described both as a legal inference and a duty of inquiry. “Constructive notice is a legal inference from established facts.” (Bierzynski v New York Cent. R.R. Co., 31 AD2d 294, 297 [4th Dept 1969], affd 29 NY2d 804 [1971], quoting Birdsall v Russell, 29 NY 220, 248 [1864].) “Constructive notice ordinarily means that a person should be held to have knowledge of a certain fact because he knows other facts from which it is concluded that he actually knew, or ought to have known, the fact in question.” (Id., quoting 42 NY Jur, Notice and Notices § 3.)
“Constructive notice also exists whenever it is shown that reasonable diligence would have produced actual notice.” (Id.)
“A person is chargeable with constructive notice of any fact which would have been disclosed by a reasonably diligent inquiry if circumstances are such as to indicate to a person of reasonable prudence and *456 caution the necessity of making inquiry to ascertain the true facts and he or she avoids such inquiry.” (Majer v Schmidt, 169 AD2d 501, 503 [1st Dept 1991].)
“One who has reasonable grounds for suspecting or inquiring ought to suspect, ought to inquire, and the law charges him with the knowledge which the proper inquiry would disclose.” (Fidelity & Deposit Co. of Md. v Queens County Trust Co., 226 NY 225, 233 [1919].) But, “[w]hen a defect is latent and would not be discoverable upon a reasonable inspection, constructive notice may not be imputed.” (See Applegate v Long Is. Power Auth., 53 AD3d 515, 516 [2d Dept 2008].)
Here, the dangerous condition that caused the infant plaintiffs injuries was the inadequately secured window guard in the living room window, and, if MRMS is to be liable for those injuries, MRMS must be found to have constructive notice of that condition for a sufficient period of time before October 3, 2002, when the child fell from the window, such that reasonable care would have called for its correction. Notice of the installation of an air conditioner, although necessitating removal of the window guard, would not suffice, since there is no evidence to suggest that the air conditioner would have provided less protection than the previously installed window guard. Although one could envision a regulatory scheme that imposed upon a landlord a duty of vigilance whenever window guards are removed to accommodate air conditioners, established common-law principles, even supplemented by the window guard regulation and the Multiple Dwelling Law, do not appear to go that far. Therefore, whether constructive notice is considered as a legal inference or duty of inquiry, notice of installation of an air conditioner would not generally trigger a duty to inspect and remedy.
Removal of an air conditioner from a window on which a required window guard had previously been installed would, therefore, be the earliest occurrence that could provide constructive notice to the landlord. Considering constructive notice from the perspective of legal inference, where the condition that causes the injury is an inadequately secured window guard, there must be “foundation facts” (see Bierzynski v New York Cent. R.R. Co., 31 AD 2d at 297) beyond removal of an air conditioner to support an inference of inadequate reinstallation of the guard. Absent additional facts (such as involvement of the landlord’s agent, discussed below), removal of an air *457 conditioner does not permit an inference that the window guard will be inadequately secured, such as to create a dangerous condition requiring remedy. Indeed, there is no evidence or contention here that any deficiency in the securing of the window guard was “visible and apparent” (see Gordon v American Museum of Natural History, 67 NY2d 836, 837 [1986]) without close inspection. (See Delosangeles v Asian Ams. for Equality, Inc., 40 AD3d 550, 552 [1st Dept 2007].)
If constructive notice is to be found here, therefore, it must be from the perspective of a duty of inquiry. “[I]mplicit” in a landlord’s “duty to maintain” a required window guard, imposed directly by the window guard regulation and indirectly by the Multiple Dwelling Law, is a “duty to make timely and adequate inspections for disrepair.” (See Showverer v Allerton Assoc., 306 AD2d 144, 144 [1st Dept 2003].) Where there is a duty to inspect, “if a reasonable inspection would have disclosed the dangerous condition, the failure to make such an inspection constitutes negligence and may make the [building] owner liable for injuries proximately caused by the condition.” (Colon v Bet Torah, Inc., 66 AD3d 731, 732 [2d Dept 2009].) And where the Multiple Dwelling Law imposes a duty to maintain despite negligence of the tenant contributing to the dangerous condition, the landlord’s duty to inspect likewise persists despite the tenant’s negligence. (See Saunders v 551 Galaxy Realty Corp., 64 AD3d 564, 565 [2d Dept 2009].)
It could be argued that, where the injury results because of an inadequately secured window guard, the duty of inquiry would not arise until the air conditioner is removed and the window guard reinstalled, since until then the dangerous condition would not exist, and there would be nothing to inspect or remedy. Where the window guard regulation does not apply, and the injury results from a falling window guard that strikes a pedestrian, the argument would seem persuasive. (See Duran v Bushwick House, LLC, 24 Misc 3d 1240[A], 2009 NY Slip Op 51830[U], *8 [Sup Ct, Kings County 2009].)
But where the window guard regulation applies, the danger that it is designed to prevent, i.e., the fall of a child from an unprotected window, arises immediately upon removal of an air conditioner from a window on which a required window guard had previously been installed. It should make no difference that injury results from an inadequately installed window guard rather than the absence of a window guard from the window; the regulatory scheme is defeated. Where the window guard *458 regulation applies, the duty of inquiry, and commensurate constructive notice, should be deemed triggered by notice of removal of the air conditioner. (See Rodriguez v Amigo, 244 AD2d 323, 325 [2d Dept 1997] [landlord may have duty of inquiry and constructive notice of a lead condition in the plaintiffs’ apartment where it has actual notice of a lead condition in another apartment in the same building].)
There must still be a breach of the landlord’s duty before the injury-producing occurrence. The dangerous condition — here deemed a window either unprotected or with an inadequately secured window guard — “must exist for a sufficient length of time prior to the accident to permit [the landlord’s] employees to discover and remedy it.” (See Gordon v American Museum of Natural History, 67 NY2d at 837.) Here, there was no direct evidence of when the air conditioner was removed from the living room window in the S. apartment, or of when the inadequately secured window guard was reinstalled. The only evidence on when the air conditioner was removed was the testimony of a neighbor that the air conditioner was still in the window “[d]ays before” the child fell. (TT at 584.)
Were this the only evidence on constructive notice, the court would agree with MRMS that it is insufficient to support a jury finding that MRMS was aware, or should have been aware, of the removal of the air conditioner from the S.s’ living room window to allow for an inspection to ensure compliance with the window guard regulation. Even assuming that the danger addressed by the regulation requires that a landlord act promptly to discharge its duties of inspection and necessary repair, a finding that those duties have been breached cannot follow only from evidence that “days before” the child fell the danger did not exist.
In addition, however, there was testimony by the infant plaintiff’s parents and the infant herself that Rene Castellanos, the building superintendent, assisted each year with the installation and removal of air conditioners — albeit from the bedroom windows and not the living room window, since they insisted there was no air conditioner installed in the living room window. “In general, knowledge acquired by an agent acting within the scope of his or her agency is imputed to the principal and the latter is bound by that knowledge even if the information is never actually communicated.” (Christopher S. v Douglaston Club, 275 AD2d 768, 769-770 [2d Dept 2000]; see also Center v Hampton Affiliates, 66 NY2d 782, 784 [1985].) “An agent is *459 presumed to communicate to his employer what he learns in the discharge of his expected duties.” (Seward Park Hous. Corp. v Cohen, 287 AD2d 157, 166 [1st Dept 2001].) This imputed notice rule has been applied to a superintendent’s knowledge of a dangerous condition in a building. (See Sawchuk v 335 Realty 58 Assoc., 44 AD3d 532, 532 [1st Dept 2007]; see also Moya v City of New York, 9 Misc 3d 332, 335-336 [Sup Ct, Kings County 2005].)
“An exception to this rule occurs when the agent has abandoned his or her principal’s interests and is acting entirely for his or her own or another’s purposes.” (Christopher S. v Douglaston Club, 275 AD2d at 770.) “To come within the exception, the agent must have totally abandoned his principal’s interests and be acting entirely for his own or another’s purposes.” (Center v Hampton Affiliates, 66 NY2d at 784-785.) “It cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal.” (Id. at 785.) In the context of landlord-tenant relations, the exception will not apply where the tenant “had no reason to believe that the [superintendent] would not tell the landlord.” (See Seward Park Hous. Corp. v Cohen, 287 AD2d at 167.)
Steven Tsevedos, MRMS’s principal, testified that Mr. Castellanos resided in the building, and received a reduction of rent to compensate him for his duties as superintendent. Mr. Castellanos would take out the garbage, sweep and mop the hallways, and make minor repairs, i.e., plumbing, carpentry, and electrical. Mr. Tsevedos’ other company, Milasen Construction, with which Mr. Castellanos held a “full-time job” (TT at 159), “would make any repair that took longer than 15, 20 minutes to accomplish” (TT at 186). There was no evidence that the S.s or any of the other tenants in the building were even informed of these arrangements. Indeed, Mr. Tsevedos testified that Mr. Castellanos himself would do work in the building without being told whether he was working for MRMS or for Milasen (TT at 176-177).
As to air conditioners, Mr. Tsevedos testified that there were many units in the windows when MRMS purchased the building. Thereafter, a tenant who wanted to install an air conditioner would notify him, and he “would hire Milasen Construction to install the air conditioner unit, but it never occurred”; “We’ve never installed an AC unit in any of those windows.” (TT at 168.) Contrary to defendant’s contention that an air conditioner could not be installed without the landlord’s approval (see affir *460 mation in support of posttrial motion 1Í 53), Mr. Tsevedos testified to no prohibition, rule, or procedure as to air conditioners that was conveyed to the S.s or other tenants in the building, or to Rene Castellanos, his superintendent. Mr. Castellanos did not testify at trial, and, therefore, there was no evidence to contradict the testimony of the S.s as to his participation in annual installation and removal of the air conditioners, for which, according to the father, Mr. Castellanos would be given $5.
Based upon the evidence, the jury could have concluded that Mr. Castellanos knew when the air conditioner was removed, giving MRMS constructive notice of the dangerous condition created, and providing MRMS sufficient time before the child’s fall to ensure that a window guard was properly reinstalled in the living room window. Even if Mr. Castellanos was acting in part for Milasen Construction, or in part for himself, or both, he was acting as well for MRMS. As Mr. Tsevedos’ testimony demonstrates, it was in the interest of MRMS to control the installation and removal of air conditioners, presumably, at least in part, because of the possibility of injury if the unit were to fall from the window (see Saunders v 551 Galaxy Realty Corp., 64 AD3d at 564; Spanbock v Fifty Fourth St. Condominium, 3 AD3d 395, 396 [1st Dept 2004]). There was no evidence that the S. family “had . . . reason to believe that the [superintendent] would not tell the landlord.” (See Seward Park Hous. Corp. v Cohen, 287 AD2d at 167.)
During their respective summations, each of the attorneys commented upon the testimony about Mr. Castellanos’ role in installing and removing the bedroom air conditioners. (TT at 681-682, 685-687, 720-721, 732-733.) Indeed, counsel for MRMS addressed the possibility that the jury would conclude, based on that testimony, that Mr. Castellanos assisted in the installation and removal of the living room air conditioner:
“So now, that super, they claim he did the air conditioner in the bedrooms. So, that means that— could he have done something in the living room unknown to anyone else?
“Well, maybe. Maybe.
“But if the parents say there was never an air conditioner in there, they’re kind of stuck with that story. They can’t say, oh, we’re liars, yes, we lied but still find for us. You can’t do that.” (TT at 717.)
The jury apparently rejected MRMS’s argument, and, although finding that an air conditioner had been installed and *461 removed in the living room window despite the S. family’s testimony to the contrary, apparently chose to accept their testimony that Mr. Castellanos always assisted with the air conditioners. Admittedly, there is no jury response on the verdict sheet that makes clear the jury’s reasoning in concluding that both MRMS and the infant’s father were responsible for the infant’s fall from the window.
“Viewing the evidence in the light most favorable to the plaintiffl ], and affording [the plaintiff) every favorable inference which may be drawn from the evidence . . . , rational jurors could conclude that the defendant . . . was negligent in failing to discover the defective condition . . . , and to take reasonable steps to prevent harm, and that such negligence was a substantial factor in causing the accident.” (See Segal v City of New York, 66 AD3d 865, 867 [2d Dept 2009].)
And “[i]f the verdict can be reconciled with a reasonable view of the evidence,” as it can here, “the successful party is entitled to the presumption that the jury adopted that view.” (See Ashby v Mullin, 56 AD3d 588, 589 [2d Dept 2008].)
To the extent, therefore, that MRMS seeks a setting aside of the jury verdict on liability, its motion is denied.
MRMS also seeks a setting aside of the jury’s damages awards for future medical expenses in the amount of $2 million and for future pain and suffering in the amount of $775,000. To the extent that MRMS seeks a setting aside of the award for future pain and suffering, MRMS makes no showing that the amount awarded is “contrary to the weight of the evidence” (see CPLR 4404 [a]), or that it “deviates materially from what would be reasonable compensation” (see CPLR 5501 [c]). The fact that there might be insufficient evidence to support a finding that the infant plaintiff will require a heart transplant (see affirmation in support of posttrial motion 1Í 98) does not mean that there is insufficient evidence to support the amount awarded for pain and suffering associated with the injuries she has admittedly suffered. To the extent, therefore, MRMS’s motion is directed to the award for future pain and suffering, it is denied.
To the extent, however, that MRMS’s motion challenges the jury’s award for future medical expenses, the motion is well-founded. “It is well settled that an award for future medical expenses may not be based upon mere speculation.” (Faas v State *462 of New York, 249 AD2d 731, 732 [3d Dept 1998]; see also Petrilli v Federated Dept. Stores, Inc., 40 AD3d 1339, 1344 [3d Dept 2007]; Stylianou v Calabrese, 297 AD2d 798, 799 [2d Dept 2002].) A plaintiff must establish future medical expenses with “reasonable certainty” (see Ellis v Emerson, 57 AD3d 1435, 1437 [4th Dept 2008]; Hyatt v Metro-North Commuter R.R., 16 AD3d 218, 219 [1st Dept 2005]), offering “competent proof of necessary, anticipated medical costs” (see Petrilli v Federated Dept. Stores, 40 AD3d at 1344).
With respect to expenses for future surgery, an award will be set aside if, after “[v]iewing the evidence in the light most favorable to [the] plaintiff! ]” (see Ellis v Emerson, 57 AD3d at 1437), the record is devoid of any “definite opinion with regard to the need for surgery” (see Faas v State of New York, 249 AD2d at 732), or an opinion “with any degree of certainty that the plaintiff would require future surgery” (see Stylianou v Calabrese, 297 AD2d at 799). An opinion as to future surgery that is not accompanied by a statement of the basis for the opinion is “unsupported by competent evidence” (see id.).
The infant plaintiff suffered both orthopedic injury and cardiac injury, and plaintiff offered the expert testimony of a pediatric orthopedic surgeon, Dr. Gail Chorney, and a pediatric cardiologist, Dr. Charles S. Kleinman. Putting aside the cost of a heart transplant, discussed below, the court finds that the evidence supports an award for future medical costs of $655,100, representing the cost of two hip replacements and related physical therapy of $204,800 (see affirmation in opposition 1ÍH 51, 53); the cost of orthopedic monitoring of $20,300 (see id. If 54); the cost of leg-lengthening surgery at $98,000 (see id.); the cost of heart bypass surgery at $100,000 (see id. 1Í 49); and the cost of cardiac monitoring at $232,000 (see id. If 50). The court rejects plaintiff’s computation of the cost for cardiac monitoring of $493,000, because it assumes a PET scan, echocardiogram, and MRI scan each year (see id.), where the evidence is clear that only one of the imaging studies would be required annually (see TT at 1150). In its computation, the court has used the highest estimated cost for any of the imaging studies.
Even by plaintiffs reckoning, the jury could not have reached an award of $2 million for future medical expenses without including $1 million for a heart transplant. (See affirmation in opposition 1111 48-56.) The jury’s award was apparently based upon the following testimony of Dr. Kleinman, which plaintiffs counsel referred to in his summation (see TT at 1302).
*463 “I myself went through a heart attack related to old radio therapy that I had had. I had a heart attack at the age of 49 that involved exactly that location of my heart. I then had bypass surgery and went about exercising and actually becoming a marathoner between 1996 and 2000. And then I gradually started to develop rhythm disturbances and eventually needed my mitral valve replaced in 2007 and on February 26th, 2008, I had a heart transplant. So I know, as well as anybody, perhaps, that you can function very well with an area of septum that’s out and then gradually wind up having progressive problems with the heart muscle that ultimately can lead to a need for further surgery, bypass, valve replacement, rhythm disturbances and even the ultimate need for total replacement.” (TT at 1140.)
“Well, you know, if she went all the way, the way I did, to a heart transplant, then that would be a major undertaking fiscally . . . you are talking about a million dollars worth of surgery and then ongoing cardiac biopsies, cauterizations, scans, probably in the range of $15,000 a year worth of immunosuppressive medications and the potential for complications after that, I mean, if she had a transplant.
“As you can probably tell, or as you may be able to tell, I am currently on chemotherapy because of secondary malignancy from my immunosuppression.” (TT at 1151.)
There is no competent evidence in the record that the infant plaintiff will, with “reasonable certainty,” require a heart transplant, and the jury’s apparent determination that she will, based upon Dr. Kleinman’s personal experience, is wholly speculative.
In sum, the jury could have rationally determined on a fair interpretation of the evidence that MRMS negligently failed to discover, and then remedy, a dangerous condition in the living room window, i.e., an inadequately secured window guard, and that MRMS’s negligence was a substantial factor in bringing about the child’s fall from the window. Based upon plaintiff’s own calculations, as modified by the court, the evidence supports an award for future medical expenses of only $655,100, rather than $2 million.
The motion of defendant MRMS Realty Corp. to set aside the juiy’s verdict is granted only to the extent that the parts of the jury verdict awarding damages for future medical expenses and *464 the period of time covered are set aside, and a new trial ordered on future medical expenses, unless, within 30 days after service upon him of a copy of this order with notice of entry, plaintiff files with the clerk of the court a written stipulation to a reduction of the award for future medical expenses to $655,100.